No. 25-10226-CC

---

In the
# United States Court of Appeals
# for the Eleventh Circuit

---

TRACY ANDERSON ET AL.,

*Plaintiffs-Appellants,*

v.

SECRETARY OF HOMELAND SECURITY,

*Defendant-Appellee*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
NO. 8:22-CR-2941-VMC-CPT

---

## BRIEF OF THE SECRETARY

---

GREGORY W. KEHOE
United States Attorney

DAWN A. TIFFIN
Assistant United States Attorney
Appellate Division

Of Counsel:

CATHERINE M. PALER-AMAYA
Senior Attorney
U. S. Customs and Border Protection
Office of the Assistant Chief Counsel
Tampa, FL
(813) 623-6331 x 2

SEAN SIEKKINEN
Assistant United States Attorney
Appellate Division
USA No. 192
400 N. Tampa St., Ste. 3200
Tampa, FL 33602
(813) 274-6000

July 7, 2025

*Tracy Anderson et al., v. Secretary of Homeland Security*

No. 25-10226-CC

## Certificate of Interested Persons
## and Corporate Disclosure Statement

In addition to the persons and entities identified in the certificate of interested persons and corporate disclosure statement in the appellants' principal brief, the following persons have an interest in the outcome of this case:

1. Kehoe, Gregory W., United States Attorney;

2. Paler-Amaya, Catherine M., Senior Attorney for United States Customs and Border Protection;

3. Thomas, Jeffrey S., plaintiff-appellant; and

4. Tiffin, Dawn A., Assistant United States Attorney.

No publicly traded entity has an interest in the outcome of this appeal.

## Statement Regarding Oral Argument

The Secretary of Homeland Security does not request oral argument.

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement..........C-1

Statement Regarding Oral Argument ...............................................................i

Table of Contents ........................................................................................ ii

Table of Citations ....................................................................................... iv

Statement of Jurisdiction ............................................................................ vi

Statement of the Issue.................................................................................. 1

Statement of the Case ................................................................................. 1

    *Course of Proceedings* ............................................................................ 2

    *Statement of the Facts*............................................................................ 6

       I.    CBP Officers and Border Searches at the Port of Tampa .............. 6

      II.    The Assistant Port Director Audits CBP's Compliance with its Border-Search Policies.......................................................... 10

     III.    After Extensive Discussions with the Union, CBP Ultimately Designates Three Slots for Female CPB Officers on the Evening Shift, to Provide Coverage for Female Searches ................................................................................ 12

    *Standard of Review* ............................................................................... 16

Summary of the Argument ......................................................................... 17

Argument and Citations of Authority ......................................................... 19

    The jury reasonably found that sex was a bona fide occupational qualification that justified placing three female CBP officers on the evening shift to ensure coverage for female searches........................... 19

ii

A.    It was not unreasonable to conclude that CBP should not routinely depend on TSA personnel, local police, or CBP agricultural specialists to search female travelers ........................ 26

B.    It was not unreasonable to conclude that CBP should not depend on off-duty female CBPOs to search female travelers ..... 32

C.    The jury's verdict was consistent with *Hardin*, *Garrett*, and all other cases addressing bona fide occupational qualifications ...... 36

Conclusion ................................................................................................. 43

Certificate of Compliance with Type-Volume Limitation

Certificate of Service

# Table of Citations

## Cases

*Babb v. Secretary of Veterans Affairs*,
   992 F.3d 1193 (11th Cir. 2021) .................................................................. 20

*Babb v. Wilkie*,
   589 U.S. 399 (2020) .................................................................................. 20

*Bailey v. Swindell*,
   89 F.4th 1324 (11th Cir. 2024) ............................................................16, 24

*Brown v. Ala. Dep't of Transp.*,
   597 F.3d 1160 (11th Cir. 2010) ............................................................16, 24

*Christopher v. Florida*,
   449 F.3d 1360 (11th Cir. 2006) ............................................................23, 30

*Dothard v. Rawlinson*,
   433 U.S. 321 (1977) ............................................................................40–42

*Garrett v. Okaloosa County*,
   734 F.2d 621 (11th Cir. 1984)..................................21, 22, 25, 36, 39, 40, 42

*Hardin v. Stynchcomb*,
   691 F.2d 1364 (11th Cir. 1982)................................21, 22, 25, 26, 33–40, 42

*Tamimi v. Howard Johnson Co.*,
   807 F.2d 1550 (11th Cir. 1987) ............................................................22, 23

*Terrell v. Secretary of Veterans Affairs*,
   98 F.4th 1343 (11th Cir. 2024) .................................................................. 20

*Terry v. Ohio*,
   392 U.S. 1 (1968) ...................................................................................... 25

*Tynes v. Florida Dep't of Juvenile Justice*,
   88 F.4th 939 (11th Cir. 2023) ..............................................................23, 24

iv

**Statutes**

5 U.S.C. § 7106(a) .................................................................12, 19

19 U.S.C. § 1582 ....................................................................... 27

28 U.S.C. § 1291 ........................................................................ vi

28 U.S.C. § 1331 ........................................................................ vi

42 U.S.C. § 2000e *et. seq.*........................................................ vi

42 U.S.C. § 2000e-2...............................................................19, 21

42 U.S.C. § 2000e–2(a) ........................................................... 19

42 U.S.C. § 2000e-2(e) .......................................................2, 21, 39

42 U.S.C. § 2000e-2(e)(1).......................................................... 3

42 U.S.C. § 2000e-16 ............................................................19, 21

42 U.S.C. § 2000e–16(a) .......................................................19, 21

**Rules**

Fed. R. App. P. 4(a) ................................................................. vi

**Other Authorities**

19 C.F.R. § 24.16(d) .............................................................34, 35

## Statement of Jurisdiction

This is an appeal from a final decision of the United States District Court for the Middle District of Florida in a civil case. That court had jurisdiction under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. *See* 28 U.S.C. § 1331. The court entered judgment on January 23, 2025, Doc. 123, and plaintiffs timely filed a notice of appeal that same day, Doc. 125. *See* Fed. R. App. P. 4(a). This Court has jurisdiction over this appeal. *See* 28 U.S.C. § 1291. On May 14, 2025, this Court granted an unopposed motion filed by plaintiff Mauricio Guerrero and dismissed his appeal, with "no impact on the remaining Appellants' appeal." App. Doc. 132

## Statement of the Issue

Whether the evidence at trial reasonably supported the jury's finding that sex was a "bona fide occupational qualification" that justified assigning three female officers to the evening shift at the Port of Tampa, so they would be available to search female travelers at those times.

## Statement of the Case

This is a federal-sector employment-discrimination case. Plaintiffs are Customs and Border Protection Officers ("CBPOs" or "CBP officers") for the Department of Homeland Security. They claim the department discriminated against them by reserving for female officers three slots on the evening shift at the Port of Tampa. Management determined that female officers were needed to search female travelers, and to witness those searches, per CBP policy. Plaintiffs agree that male officers should not search or witness the search of female travelers. They do not challenge CBP's same-sex border-search policy. Nevertheless, they claim that, rather than requiring some female CBP officers to be on duty, CBP should have instead relied on non-CBP officers—who are not trained to conduct border searches—or should have attempted to call in off-duty CBP officers from home or elsewhere. A jury found that staffing female CBP officers was reasonably necessary to the normal operation of the Port of Tampa, that no other arrangement of job responsibilities would have

1

been effective, and therefore that sex was a bona fide occupational

qualification for these positions under 42 U.S.C. § 2000e-2(e).

## Course of Proceedings

Tracy Anderson (née Brown), Sageline Laurent, Rebecca Morales, and

Jeffrey Thomas are CBP officers who worked at the Port of Tampa in 2018. *See*

Doc. 1 ¶¶ 8–13. They are the plaintiffs-appellants in this case.[1] In 2022, they

filed a Title VII lawsuit claiming that the Department of Homeland Security

had discriminated against them on the basis of sex. *Id.* ¶¶ 181–90. They alleged

that their collectively bargained, seniority-based "bid, rotation, and placement"

process (BRP) was applied in discriminatory manner because, in 2018, the

agency reserved three slots on the evening shift for female CBPOs so that some

female officers would be on duty and available to search female travelers. *Id.*

¶¶ 29–81.

Anderson, Laurent, and Morales are female. Doc. 1 ¶¶ 97–98. As the

least senior female officers at the Port of Tampa, they were involuntarily

assigned to the evening shift because no other female officers wanted to work

at that time. *Id.* ¶¶ 97–112. Thomas is male. *Id.* ¶¶ 82. He was denied a

---

[1]Two other plaintiffs—Steven Peak and Mauricio Guerrero—originally joined the complaint. *Id.* Peak voluntarily dismissed his claim in October 2023. *See* Doc. 38. Guerrero remained a party through trial and initially joined in the appeal but later voluntarily dismissed his appeal. *See* App. Doc. 25.

position on the evening shift. *Id.* ¶¶ 87–91. Plaintiffs alleged that the "facially discriminatory policy caused a material change" in the terms, conditions, or privileges of their employment, and that the policy violated Title VII unless sex was a "bona fide occupational qualification" under 42 U.S.C. § 2000e-2(e)(1). *Id.* ¶¶ 185–86. They sought back pay, compensatory damages, injunctive relief, and a declaration that "the designation of female-only slots in the FY2018 BRP process at the Area Port of Tampa violated Title VII." *Id.* at 40.

The Secretary of Homeland Security sought summary judgment based on the affirmative defense identified in the complaint. *See* Doc. 74. Plaintiffs had correctly alleged that Title VII allows an employer to discriminate on the basis of an otherwise protected characteristic—including sex—if the characteristic is a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1). In this case, plaintiffs agree that females are needed to search female travelers (one female officer to conduct the search and one to witness it). They do not challenge the agency's same-sex border-search policy. *See* Doc. 81 at 25. Nevertheless, they claim that requiring female CBPOs to be on duty at certain times runs afoul of Title VII. On summary judgment, the United States argued that sex was a bona fide occupational qualification for the designated female-only slots. *See* Doc. 74 at 15–24.

3

The district court agreed that that "the essence of the CBP's business is 'securing the border' ... [and] 'conducting personal searches of individuals entering the country who are suspected of carrying contraband.'" Doc. 81 at 26. The court also agreed that "screening same-sex passengers is essential to the employer's business and public safety." *Id.* at 27. Nevertheless, the court found disputed issues of material fact regarding "reasonable alternatives" to female-only shifts. *Id.* at 27–32. The court concluded that reasonable and fair-minded jurors might find that the agency had overlooked other ways to accomplish same-sex border searches, which could defeat the Secretary's BFOQ defense. *Id.* at 32. Accordingly, the court denied the Secretary's motion for summary judgment. *Id.* at 32–33. And, for the same reasons, it denied plaintiffs' cross-motion for summary judgment. *Id.* at 32.

A five-day jury trial followed. *See* Doc. 119. Five plaintiffs testified (these plaintiff-appellants plus Mauricio Guerrero, who has voluntarily dismissed his appeal, App. Doc. 25). *See* Doc. 116 at 25–199; Doc. 117 at 5–30. Plaintiffs also called their former union president, Doc. 115 at 61–135, and the director of the Port of Fresno, Doc. 116 at 7–22. The Secretary called four witnesses: a watch commander at the Port of San Diego, Doc. 117 at 32–80; a supervisory CBP officer at the Port of Tampa, Doc. 117 at 82–99; the operations director for CBP's southeastern region, Doc. 117 at 100–138; and the former assistant

director of the Port of Tampa, Doc. 117 at 140–Doc. 118 at 152. The parties collectively introduced 40 exhibits. *See* Docs. 107, 109.

On the fifth day, the jury returned a verdict for the Secretary. *See* Doc. 106. In rejecting plaintiffs' claims, the jury found that, although the agency had treated each plaintiff "differently because of their gender," sex was a bona fide occupational qualification justifying the disparate treatment, because the Secretary had demonstrated: (1) that "female-only assignments [were] reasonably necessary to the operation of the Port of Tampa—that is, the essence of the Port's business would [have been] undermined without the female-only assignments"; (2) that the agency "had a factual basis for believing that all or substantially all male CBPOs would be unable to safely and efficiently perform the duties of the assignments designated female-only"; and (3) that due to the nature of the port's operation, the agency "could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of female travelers and the employment opportunities of male and female CBPOs." *Id.* at 2–3. The jury found each element by a preponderance of the evidence. *Id.*

Plaintiffs sought judgment as a matter of law, arguing that "the jury lacked legally sufficient evidentiary basis for its finding on the BFOQ affirmative defense" because, in plaintiffs' view, the evidence showed that the

5

assistant port director had failed to "consider[] two viable alternatives" to female-only shifts. Doc. 113 at 1–3. Rather than designating certain slots on the evening shift for female CBP officers, the agency should have (1) "occasionally [sought] assistance from female non-CBPOs," *id.* at 3, or (2) "[paid] overtime to female CBPOs who it could call in [from off-duty] ... on the rare occasions that such a need arose," *id.* at 7, plaintiffs said.

Viewing the evidence in the light most favorable to the nonmoving party, the court found that there was "sufficient evidence presented at trial for a reasonable jury to conclude that Defendant had established its BFOQ affirmative defense." Doc. 122 at 7. "In short," the court observed, "both Plaintiffs and Defendant presented testimony and evidence they believed supported their respective positions at trial." *Id.* at 16. "While Plaintiffs still feel that their evidence was superior to Defendant's, there was sufficient evidence" for the jury to find otherwise. *Id.* The court therefore declined to set aside the jury's verdict. *Id.* Plaintiffs now ask this Court to set it aside.

## Statement of the Facts

### I.    CBP Officers and Border Searches at the Port of Tampa.

We will discuss the testimony and exhibits relevant to the Secretary's BFOQ defense. That is the only issue on appeal.

Customs and Border Protection is a federal law-enforcement agency

within the Department of Homeland Security. *See* Doc. 109-1 at 2 (Def. Ex. 1). It serves as the nation's primary border-control organization. *See* Doc. 109-3 at 6 (Def. Ex. 3). Its mission includes preventing terrorists and instruments of terror from entering or exiting the United States; detecting, interdicting, and apprehending human smugglers and contraband; and facilitating the orderly and efficient flow of lawful trade and travelers. *See* Doc. 109-1 at 2 (Def. Ex. 1). CBP officers are armed front-line law-enforcement agents responsible for processing, screening, and—when appropriate—admitting into the United States travelers and crew arriving or returning from abroad. *See* Doc. 115 at 64 (union president); Doc. 117 at 7 (plaintiff); Doc. 117 at 150–51 (assistant port director). CBP officers are trained to conduct searches and make arrests. *See* Doc. 115 at 64. They are also trained in "securing and detaining suspected persons" and in the "controlled use of force up to and including deadly force." Doc. 116 at 41–42 (plaintiff). "Most of what we try to do ... is to find drugs, narcotics, anything that might harm the U.S. public," one plaintiff explained at trial. Doc. 117 at 7; *see also id.* at 152 (similar testimony from assistant port director).

In 2018, sixty-three CBP officers were assigned to the Port of Tampa, encompassing mainly the Tampa seaport and Tampa International Airport, but also a few smaller airports in the region. *See* Doc. 117 at 155–56 (assistant

area port director); Doc. 107-5 at 7 (Pl. Ex. 5). Port of Tampa officers sometimes traveled between airports or between an airport and the seaport in the same shift. *See* Doc. 117 at 155. Flights would arrive between 9:00 a.m. and 9:00 p.m. *Id*. at 156. Cruise ships would arrive between 7:00 a.m. and 8:00 a.m. *Id*. at 157. And cargo ships could "come in at any time of day." *Id.*

There were 55 male officers but only eight female officers. *See* Doc. 107-5 at 7 (Pl. Ex. 5). The scarcity of female CBPOs presented an issue because male officers generally cannot search female travelers (or vice versa). *See* Doc. 107-3 at 16 (CBP handbook, Pl. Ex. 3). "A CBP officer conducting a personal search ... must be of the same gender as the person being searched, except when the officer conducts an immediate patdown for officer safety." *Id*. And a witness (likewise same gender) must be present for all searches, except for "immediate patdowns for officer safety." *Id*. Plaintiffs do not challenge this policy. They agree that "the sex of the person conducting the search and the witness have to be the same sex as the traveler." Doc. 116 at 173 (plaintiff's testimony). But they dispute *which* females should conduct and witness border searches, as explained below.

CBP officers are authorized to compel other law-enforcement officers— or any federal employees—to conduct personal searches, and to compel anyone—even civilians—to act as witnesses, but "**only** when another CBP

8

officer is unavailable." Doc. 107-3 at 17 (emphasis in original). With this policy in mind, the operations director for CBP's southeastern region testified that port managers should "staff ports to avoid CBPOs being unavailable." *See* Doc. 117 at 117. He told the jury that non-CBPOs should help with searches only in "extremely rare[]" circumstances. *Id*. at 120.

The CBP Personal Search Handbook further states that "[i]f another person (civilian or non-CBP officer) conducts or witnesses a personal search because of a difference in gender between the person and the [CBP] officer, a CBP officer will remain immediately outside the search room to render assistance as appropriate." Doc. 107-3 at 17. "Non-law-enforcement officers witnessing a personal search [should be instructed] not to intervene in any physical altercation that may occur, but to immediately notify law enforcement personnel in the area." *Id*. On this point, the regional operations director noted that an officer conducting a search could be in "immediate danger" from "a physical altercation" if the observing witness is not an appropriately trained CBP officer ready and able to intervene. *See* Doc. 117 at 138. And plaintiffs' former union president agreed that CBP agricultural specialists, for instance, would be less "physically equipped to assist if there's a physical altercation." Doc. 115 at 111.

## II.    The Assistant Port Director Audits CBP's Compliance with its Border-Search Policies.

In June 2017, a supervisory CBP officer from Cape Canaveral—Robert Diaz—was promoted to assistant director of the Port of Tampa. *See* Doc. 117 at 149–50. When Diaz arrived, he was instructed to "keep working towards building the port to follow policy." *Id.* at 159. A recent high-profile lapse had turned into "a national incident." *Id.* Previous management had violated CBP policy by declining to detain an inadmissible traveler and instead releasing him into the United States. *Id.* at 160. The traveler "ended up committing a very serious crime" that drew national attention. *Id.* Diaz arrived in Tampa with a mandate "to make sure that that didn't happen in the future." *Id.* at 159.

Diaz understood the assignment. He began by reviewing records of searches, seizures, and arrests going back to the beginning of 2016. *See* Doc. 117 at 160–61. His comprehensive review revealed that "Tampa [was] a busy port" and, unfortunately, "there were certain parts of policy that they were not following." Doc. 117 at 163. He noticed many recurring problems involving searches of female travelers in 2016 and 2017 (Doc. 117 at 182, 184). First, male CBP officers had often conducted or witnessed female searches, *see* Doc. 117 at 163, 167–69, 171, sometimes conducting a full personal search under the guise of an unwarranted safety pat-down ("immediate" search), *id.* at 184–

10

85; Doc. 118 at 14–17. (For security reasons, safety pat-downs may be opposite-gendered. *See* Doc. 109-3 at 15 (Def. Ex. 3)). And some female travelers had been searched with no witness at all. *See* Doc. 117 at 170; Doc. 118 at 18. Equally troubling, many female travelers who should have been searched were not. *See* Doc. 117 at 169, 172–81; Doc. 118 at 13–14.

"We [had] a systemic issue" going back to at least the beginning of 2016 where "female inspections ... [were] not being performed," Doc. 117 at 178, or the search of a female traveler "[was] being witnessed by a male officer," *id*. at 170, or someone not "trained in CBP personal search policy [was] performing the personal search," *id*. at 167, Diaz testified. He was "very concerned" because each lapse had violated CBP policy. *Id*. at 167, 170–73, 177; Doc. 118 at 14, 16. It was Diaz's responsibility as assistant port director "to ensure compliance with [CBP's] personal search policy." *Id*. 118 at 54.

Diaz reported his findings to the port director. Doc. 118 at 38. "As a team, we realized that it was a concern, and we had to plan how to address it," Diaz testified. *Id*. The port director, Diaz, and other assistant port directors agreed that "scheduling changes" were in order. *Id*. at 39. CBP officers' duties and schedules at the Port of Tampa were set through a collectively bargained "bid, rotation, and placement" process. *Id*. In fall of 2017, management notified the union that they planned to require some female officers to work

11

certain shifts, as part of the BRP process, to ensure adequate coverage. *Id.* at 40–41.

### III. After Extensive Discussions with the Union, CBP Ultimately Designates Three Slots for Female CPB Officers on the Evening Shift, to Provide Coverage for Female Searches.

Federal agencies have discretion to "assign work … and to determine the personnel by which agency operations shall be conducted" in accordance with applicable laws. 5 U.S.C. § 7106(a). Nevertheless, plaintiffs' union objected that CBPOs would be "adversely affected" by requiring some female officers to be available at particular times. Doc. 118 at 41. Management and the union "tried to [find] a solution that would be the least impact[ful] to employees" but the two sides "could never agree." *Id.*

At first, management proposed rotating each female officer through the female-only shifts, spreading the burden equally. Doc. 118 at 55. The union, however, opposed that. *Id.* at 56.

Other possibilities included hiring more female officers or relying on female supervisors, female agricultural specialists, or female personnel from a different agency (TSA) to assist with searches, but none of these options were viable. Doc. 118 at 55–58. Diaz testified that it would not have been possible to hire more officers, *id.* at 55; that they could not have relied on female

supervisors because there were only two of them at the time and they "may not [have been] available" when needed, *id.* at 56; and that, although TSA personnel and CBP agricultural specialists would have been available, they were not law-enforcement officers, were not trained to conduct searches, were not armed, and were not capable of providing full backup and protection like a CBP officer, *id.* at 56–57; *see also* Doc. 115 at 108–11 (union president). Plaintiffs' former union president agreed that local police—particularly female officers—would not always be available to conduct searches, either. *See* Doc. 115 at 113–14.

Finally, management considered calling in off-duty female CBPOs to search female travelers when needed. Doc. 118 at 35. Diaz explained, however, that this also would have been unworkable. For one thing, off-duty CBPOs are not issued government phones (Doc. 115 at 56) and have no obligation to answer their personal phones or to be available for work (Doc. 118 at 36; Doc. 116 at 56). But even if two off-duty CBPOs answered the call and agreed to report, a traveler waiting to be searched would be stuck in limbo unpredictably, in the custody of another officer or a supervisor, until the responding female officers arrived. *See* Doc. 118 at 36. On top of that, CBP would have to pay overtime to responding off-duty officers, contrary to the agency's collectively-bargained responsibility to "schedule all work assignment

13

in a manner which minimizes the cost to the government or party in interest." *Id.* at 31. Accordingly, management and the union found no reasonable and mutually acceptable alternative to requiring some female CBP officers to work certain shifts.

Nevertheless, management offered a compromise. They had initially proposed six slots per day for female officers: three morning slots and three evening slots, seven days per week. Doc. 118 at 42–47. Three slots were necessary to ensure two female officers on duty for each shift because CBP officers work four or five days a week—so one of three officers would be off each day. *Id.* But the "union president was very adamant on helping his employees to get the shift that they wanted." *Id*. at 47. With the union still opposed to rotating female CPBOs equally, management consequently agreed to eliminate female-only slots for the morning shift, leaving just three designated slots in the evening. *Id*. at 42–47. Diaz recorded that the union president "agreed to" this change. Doc. 109-13 (email notes, Def. Ex. 13).

Diaz himself was comfortable without designated female slots for the morning shift because female CBP officers would be on-duty and onsite at those times, regardless, albeit in other areas of the port. Onsite female CBP officers could be redeployed quickly to conduct or witness searches as needed during the morning shift, at no cost to the agency. *See* Doc. 118 at 42–47, 138–

14

39; *see also id.* at 57–58 (explaining preference for trained CBPOs to conduct and witness searches whenever possible). Availability was a bigger problem in the evening. The eight female CBP officers in Tampa preferred the morning shift. *See* Doc. 107-4 at 7, 34–36, 47, 50–51, 56, 58 (Pls. Ex. 4); Doc. 107-5 at 3–6 (Pls. Ex. 5). One plaintiff testified that, in his experience, two female CBP officers were rarely available when a female traveler needed to be searched in the evening. *See* Doc. 116 at 151 ("Pretty much all the time there was not two female officers available [on the evening shift]."). Another plaintiff agreed that "there would have been no female CBPOs to conduct or witness a search from 5:30 to 11 p.m. any day of the week." *Id.* at 190.

Diaz testified that management's decision to maintain three female slots for the evening shift was not "made lightly." Doc. 118 at 59. He knew that CBPOs have difficult and irregular jobs with unanticipated overtime and night shifts. *Id.* "[A]s a manger," Diaz wanted his "employees to have the best work life balance"; he knew it was difficult to work shifts that don't "go well with their life outside of work." *Id.* "The needs of the service may not meet the needs of their family," Diaz acknowledged, but, "as a manager," he said, "you have to make a tough decision to uphold the law and protect the U.S. and the oath that you took to protect this country." *Id.* at 59–60. In November 2017, Diaz and the union president met to assign work units and shifts based on each

15

officer's seniority and preference, and taking into account the need for three female officers on the evening shift. *See id.* at 48–49; Doc. 115 at 86–87. The three least senior female officers were assigned to the evening shift because no female officer had preferred it. *See* Doc. 107-5 at 3–6 (Pls. Ex. 5); Doc. 107-8 (Pls. Ex. 8). Officers assigned to the evening shift received a 15% pay differential. *See* Doc. 116 at 57 (plaintiff's testimony).

In June 2022, Diaz moved to the Port of Dulles in Washington, D.C. *See* Doc. 118 at 5. Notably, the problems that Diaz had identified in 2016 and 2017 at the Port of Tampa have not arisen at Dulles. *Id.* That port has 250 CBP officers and "enough female officers spread throughout all the shifts." *Id.* at 5–6. There is no need for female-designated CBOP shifts at Dulles. *Id.* at 6.

### Standard of Review

This Court reviews de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard that the district court applied, which gives substantial deference to the jury. *Brown v. Ala. Dep't of Transp.* 597 F.3d 1160, 1173 (11th Cir. 2010). This Court "will not second-guess the jury or substitute [its] judgment for [the jury's]," so long as the "verdict is supported by sufficient evidence." *Bailey w. Swindell*, 89 F.4th 1324, 1329 (11th Cir. 2024) (reversing grant of judgment as a matter of law and reinstating jury verdict).

16

## Summary of the Argument

The jury reasonably found that sex was a bona fide occupational qualification for the female-only CBPO slots on the evening shift. Plaintiffs do not dispute that the essence of the port's business would have been undermined without the female-only slots, nor that the agency had a factual basis for believing that all or substantially all male CBPOs would be unable to perform the duties required for the designated slots, as the jury found. The only issue is the third part of the BFOQ defense in this case: whether CBP could have rearranged job responsibilities in a way that would have eliminated the clash between the privacy interests of female travelers and the employment opportunities of male and female CBPOs.

The evidence supported the jury's finding that other arrangements would not have worked. First, the jury could have reasonably concluded that CBP could not or should not routinely rely on other female CBP employees, female TSA personnel, or female police officers to search or witness the search of female travelers. They are not trained to conduct sensitive and intrusive border searches. The regulation authorizing CBPOs to enlist help from others makes clear that search authority should be delegated to non-CBPOs only in unusual circumstances when "another CBP officer is unavailable." Making female CBPOs entirely unavailable on certain shifts and routinely relying instead on

17

non-CBPOs to search female passengers would flout that limitation. Doing so on a regular basis would undermine the safety and effectiveness of border searches, which should normally be performed by the CBP officers who are trained to do so.

Second, the jury could have reasonably concluded that CBP could not or should not routinely rely on off-duty female CBPOs to search female travelers. That would be even more problematic than relying on non-CBPOs because off-duty officers may not have been available at all. The practical obstacles to calling in off-duty female officers to search female passengers doomed this proposal. Additionally, the jury could have found that attempting to use off-duty officers would not have been cost-effective because it would have required unnecessary overtime pay that could have been avoided by using on-duty officers.

The cases that plaintiffs cite cast no doubt on the jury's finding that sex was a bona fide occupational qualification for these positions in these circumstances. Plaintiffs provide no valid reason to second-guess the jury. The district court correctly declined to grant judgment as a matter of law.

## Argument and Citations of Authority

### The jury reasonably found that sex was a bona fide occupational qualification that justified placing three female CBP officers on the evening shift to ensure coverage for female searches.

Federal agencies have discretion to "assign work … and to determine the personnel by which agency operations shall be conducted" in accordance with applicable laws. 5 U.S.C. § 7106(a). Title VII prohibits private employers and the federal government alike from discriminating based on protected characteristics. *See* 42 U.S.C. § 2000e-2 (unlawful employment practices generally); 42 U.S.C. § 2000e-16 (employment by the federal government).[2] The Supreme Court and this Court have addressed the differences between the federal-sector and private-sector anti-discrimination provisions in Title VII and

---

[2]Title VII's federal-sector anti-discrimination provision states that "[a]ll personnel actions affecting employees or applicants for employment ... in executive agencies ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). Title VII's private-sector anti-discrimination provision states that "it shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin, or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a).

in the Age Discrimination in Employment Act (ADEA). *See Babb v. Wilkie*, 589 U.S. 399 (2020); *Babb v. Secretary of Veterans Affairs*, 992 F.3d 1193 (11th Cir. 2021); *Terrell v. Secretary of Veterans Affairs*, 98 F.4th 1343 (11th Cir. 2024). The cases explain that federal employees—unlike private employees—may obtain certain relief for unlawful discrimination that plays a role in the employment-decision-making process, even if it does not affect the final decision or ultimate action. *See Babb*, 589 U.S. at 413–14; *Babb*, 992 F.3d at 1199; *Terrell*, 98 F.4th at 1351–52. This case, though, presents a different issue.

Here, there is no dispute that a protected characteristic—sex—played a role in the challenged personnel actions. The agency reserved three slots on the evening shift for female CBP officers and required some female officers to work that shift, which thus forced some male officers onto the morning shift despite their preference to work in the evening. *See* Doc. 115 at 86–87; Doc. 118 at 42–49. The question is whether the jury reasonably determined that sex was a "bona fide occupational qualification" for the female-only positions. *See* plaintiff's brief at 11–12.

Title VII states that, "[n]otwithstanding any other provision of this subchapter," "it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a

bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e).[3] This exception "allows sex based discrimination when sex is a bona fide occupational qualification." *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370 (11th Cir. 1982).

"The BFOQ defense has been construed very narrowly to apply only when the essence of the business operation would be undermined by not hiring members of one sex exclusively." *Garrett v. Okaloosa County*, 734 F.2d 621, 624 (11th Cir. 1984); *see also Hardin*, 691 F.2d at 1370. An employer can satisfy its burden on this defense "only by proving that they had a factual basis for believing that all or substantially all [members of one sex] would be unable to safely and efficiently perform the duties of the job." *Hardin*, 691 F.2d at 1370. Even then, the employer must also "prov[e] that because of the nature and operation of the business, they could not rearrange job responsibilities in a way that would eliminate the clash between," on one hand, the interests served by the challenged sex-based classification, and, on the other hand, the

---

[3]The BFOQ exception appears in the section of Title VII that contains the private-sector anti-discrimination provision—section 2000e-2—but the exception is directed at all provisions "of this subchapter." § 2000e-2(e). Subchapter VI includes sections 2000e-2 and 2000e-16, the latter of which contains the federal-sector anti-discrimination provision. *See* § 2000e-16(a). Thus, the BFOQ exception expressly applies both to private-sector and federal-sector discrimination claims.

21

"employment opportunities" of adversely affected employees or candidates. *Id.* at 1370–71.

Following *Hardin* and *Garrett*, the jury was asked to decide three things regarding the Secretary's BFOQ defense in this case. First, the verdict form asked whether "female-only assignments [were] reasonably necessary to the operation of the Port of Tampa—that is, the essence of the Port's business would [have been] undermined without the female-only assignment." Doc. 106 at 3. Second, it asked whether agency "had a factual basis for believing that all or substantially all male CBPOs would be unable to safely and efficiently perform the duties of the assignments designated female-only." *Id.* Finally, it asked whether the agency "could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of female travelers and the employment opportunities of male and female CBPOs." *Id.* The jury found that the Secretary had proven all three things by a preponderance of the evidence, thus demonstrating that sex was a bona fide occupational qualification for these positions. *Id.*

The third finding—that alternative arrangements would not have sufficed—was required in *Hardin* but not in *Garrett* or other Eleventh Circuit cases. *Contrast Hardin*, 691 F.2d at 1370–71 (requiring defendant to prove that it could not have rearranged job responsibilities) *with Tamimi v. Howard Johnson*

22

*Co.*, 807 F.2d 1550, 1554 (11th Cir. 1987) (noting that the defendant could have "established a 'bona fide occupation qualification'" by demonstrating that requiring female employees to wear makeup was "necessary to maintain the defendant's public image," with no mention of potential alternative arrangements). It is not clear whether lack of alternative arrangements should be treated as a distinct element of the BFOQ defense (as the jury was asked to decide in this case) or as part of the other elements. *See* Doc. 95 at 5–9 (Secretary's objections to alternative-arrangements instruction). In any event, this jury found by a preponderance of the evidence that the Secretary had proven each part of the BFOQ defense, as instructed by the court, including that alternative arrangements would not have sufficed.

The district court found that the evidence fairly supported the jury's findings and therefore declined to grant judgment as a matter of law. *See* Doc. 122 at 7, 16. Judgment as a matter of law is appropriate only when "the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Tynes v. Florida Dep't of Juvenile Justice*, 88 F.4th 939, 943 (11th Cir. 2023). "[I]f there is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Christopher v. Florida*, 449 F.3d 1360, 1364 (11th Cir. 2006).

This Court reviews de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard that the district court applied, which gives substantial deference to the jury. *Brown v. Ala. Dep't of Transp.* 597 F.3d 1160, 1173 (11th Cir. 2010). "To win after trial, [plaintiffs] would have needed to explain why the evidence, taken as a whole, was insufficient to support the jury's verdict." *Tynes*, 88 F.4th at 948 (affirming denial of motion for judgment as a matter of law). "In making that determination, [this Court] review[s] all of the evidence in the record," "draw[ing] all reasonable inferences in favor of the nonmoving party," neither reweighing the evidence nor making credibility determinations, because "[t]hose are the jury's functions." *Brown,* 597 F.3d at 1173. This Court "will not second-guess the jury or substitute [its] judgment for [the jury's]," so long as the "verdict is supported by sufficient evidence." *Bailey v. Swindell*, 89 F.4th 1324, 1329 (11th Cir. 2024) (reversing grant of judgment as a matter of law and reinstating jury verdict).

Plaintiffs argue that the jury erred on the third part of the BFOQ analysis, as it had been instructed, because "the evidence was insufficient to show that CBP could not make alternative arrangements to eliminate the clash between ensuring that females perform and witness patdowns of females and affording all CBP officers the opportunity to receive assignments based on

24

seniority, not gender." Plaintiffs' brief at 17. Plaintiffs do not challenge the jury's findings on the other BFOQ elements (that the female-only positions were reasonably necessary because the "essence of [CBP's] business operation would be undermined by not hiring members of one sex exclusively" for those positions, *Garrett*, 734 F.2d at 624, and that CBP "had a factual basis for believing that all or substantially all [men] would be unable to … perform" the duties required for the female-only positions, *Hardin,* 691 F.2d at 1370).

The district court correctly denied plaintiffs' motion for judgment as a matter of law. The evidence sufficiently supports each finding under the deferential standard of review. No wonder the jury found that it was reasonably necessary to schedule female CBP officers and that men would have been unable to perform the required duties (searching female travelers). Even "a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons"—as in a *Terry* stop—"is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry v. Ohio*, 392 U.S. 1, 16–17 (1968). CBP searches are far more intrusive. *See* Doc. 109-3 at 24–30 (Def. Ex. 3); Doc. 117 at 120–26. Plaintiffs do not claim that male officers should be permitted to search female travelers.

We will explain why the jury reasonably could have determined that

delegating border searches to female TSA personnel or CBP agricultural specialists, or attempting to call in off-duty female CBPOs, would not have eliminated the clash between, on one hand, the interests advanced by female-only CBPO shifts—*i.e.*, privacy, security, and compliance with CBP policy—and, on the other hand, employment opportunities for male and female CBPOs. *See Hardin*, 691 F.2d at 1370–71. Rational and fair-minded jurors could have believed that the proposed alternatives would have been inadequate, as CBP concluded when it considered and rejected them.

**A.    It was not unreasonable to conclude that CBP should not routinely depend on TSA personnel, local police, or CBP agricultural specialists to search female travelers.**

Plaintiffs claim CBP need not have staffed female CBP officers in the evening because they could have enlisted other female CBP employees (agricultural specialists), female TSA personnel, or female police to search female travelers at those times. *See* plaintiffs' brief at 17–21. We agree that, in rare situations, CBP may sometimes enlist other law-enforcement officers or federal employees to conduct a search or act as a witness, in compliance with the same-sex policy. *See* Doc. 107-3 at 17. But the CBP Personal Search Handbook emphatically directs CBP officers to "[u]se this authority **only** when another CBP officer is unavailable." *Id*. (emphasis in original). And for good reason. CBP officers are specially trained law-enforcement officers. *See* Doc.

115 at 64, 78–79, 110–11 (union president); Doc. 116 at 41–42 (plaintiff); Doc. 117 at 7 (plaintiff); Doc. 117 at 103–13, 137–38 (regional branch chief and operations director); Doc. 117 at 150–54, 173 and Doc. 118 at 57–59 (assistant port director). They are responsible for enforcing hundreds of laws. *See* Doc. 117 at 103. Finding and identifying contraband is a core responsibility. *See* Doc. 115 at 110–11; Doc. 117 at 7, 108–13, 173. They have experience and expertise dealing with travelers entering or returning to the United States from different countries for different reasons. *See* Doc. 115 at 64; Doc. 117 at 153–54. CBP officers know what to look for and what to do if they find it. *See* Doc. 115 at 78–79, 110–11. That is their job. Unfortunately, angry and potentially violent confrontations can sometimes be part of the job. *See* Doc. 115 at 111; Doc. 117 at 137–38. CBPOs are armed law-enforcement officers, unlike TSA personnel or CBP agricultural specialists. *See* Doc. 117 at 103; Doc. 118 at 56–59.

Delegating sensitive border searches to other law-enforcement agents or to civilian federal employees should be a last resort, as the policy suggests—not routine. The policy permits it, when necessary, *see* Doc. 107-3 at 17, but it does not follow that ports may regularly make female CBPOs unavailable in favor of non-CBPOs. Congress specifically authorized "female [customs] inspectors for the examination and search of persons of their own sex." 19 U.S.C. § 1582.

27

And the operations director for CBP's southeastern region testified that port managers should "staff ports to avoid CBPOs being unavailable," Doc. 117 at 117, and that non-CBPOs should help with searches only in "extremely rare[]" circumstances, *id.* at 120.

"Very small" ports with only a handful of CBP officers—like Fresno— are an example. Doc. 116 at 16. The director of the Port of Fresno testified that they sometimes ask female TSA personnel to witness searches of female travelers, when two female CBPOs are not available. *Id.* at 13–15. But Fresno has just seven CBPOs, male and female. *Id.* at 17. And even so, despite its smaller staff, that port still "typically" manages to have "two female CBP officers available … to perform a search" (though sometimes not): a female supervisor and at least one female CBPO. *Id.* at 12–13. The Fresno director said they have had no trouble getting female TSA personnel to act as witnesses *when a second female CBPO is not available,* and in the "rare instances" when a female traveler needs to be searched at that port. *Id.* at 13–14. CBP policy certainly permits that. *See* Doc. 107-3 at 17. That does not imply, however, that it is prudent or acceptable for a port with more officers—like Tampa—to schedule regular shifts with *no* female CBP officers, routinely relying on TSA personnel or others to do their jobs for them. That would undermine the directive to limit outsourcing. "To protect the traveler and the agency, you

28

need CBP policy-trained officers, armed officers … to perform the personal search." Doc. 118 at 57–58 (assistant port director). "You want to have someone who knows CBP policy performing the search." *Id.* at 58.

The Port of Tampa itself further illustrates the point. Assistant Port Director Diaz discovered that CBP officers had failed to follow the CBP search handbook with concerning regularity. *See* Doc. 117 at 163–85; Doc. 118 at 13–18. That's why management designated three slots on the evening shift for female CBP officers. *See* Doc. 118 at 38–39, 54. CBP could have called on local police or TSA all along, when needed—and occasionally did so—but for whatever reason, without female CBPOs on duty, male CBPOs or other men had often improperly conducted or witnessed the search of female travelers (or skipped important searches entirely). *See* Doc. 117 at 163–85; Doc. 118 at 13–18. Plaintiffs' union president testified that local police, particularly female officers, were not always available. *See* Doc. 115 at 113–14. The jury reasonably could have found that maintaining the status quo was not a viable alternative to the common-sense change that management chose after extensive discussions with the union: scheduling female CBPOs on a regular basis to achieve the operational mission. *See* Doc. 115 at 113–14; Doc. 118 at 31–36, 42–47, 55–60. With just three female-only slots on the evening shift, the change was no greater than necessary to ensure adequate coverage for

29

appropriate same-sex searches of female travelers in compliance with CBP policy. *See* Doc. 116 at 151, 190; Doc. 118 at 42–47, 138–39.

Plaintiffs say it would have been "'reasonable to routinely rely on assistance from other female law enforcement personnel or even members of the public' as an alternative to designating female-only assignments on the night shift" for two reasons. Plaintiff's brief at 18 (quoting district court). But it was not unreasonable for "fair-minded" jurors "in the exercise of impartial judgment" to think differently. *Christopher*, 449 F.3d at 1364. First, plaintiffs claim "the evidence showed that searches of females at night were far from 'routine'" because "only seventeen of the 88 incidents involving females in FY2016 occurred on the night shift." *Id.* at 18–19 (citing testimony of assistant port director). Those "88 incidents," however, were only part of the data that Assistant Port Director Diaz had reviewed. The cited testimony was in response to a question about interactions that Diaz had reviewed and recorded from the "SAS" system. (Def. Ex. 8). *See* Doc. 118 at 97; Doc. 109 at 2. He had also reviewed and recorded data from another system ("IOIL") reflecting dozens more CBPO interactions with female travelers in 2016 and 2017. *See* Doc. 109 at 2; Doc. 109-9 (Def. Ex. 9). Taken together, the data from both systems showed "a systemic issue," Diaz testified, going back to at least the beginning of 2016, where female searches were "not being performed," Doc.

117 at 178, or the search of a female traveler "[was] being witnessed by a male officer," Doc. 117 at 170, or someone not "trained in CBP personal search policy [was] performing the personal search," Doc. 117 at 167. Diaz was "very concerned" because each lapse was a policy violation and a potential security issue. *See* Doc. 117 at 167, 170–73, 177; Doc. 118 at 14, 16. The jury reasonably could have concluded that these "incidents" were no small matter, whenever and however frequently they occurred. Even if, as plaintiffs say, there were "only" 17 incidents on the night shift in 2016, the jury might have thought that was 17 too many, and that port management had no choice but to schedule sufficient female CBP officers to ensure compliance in the future.

Second, plaintiffs claim there was no evidence that "the use of non-CBP officers, which occurred in Tampa and at other ports before and after the designation of female-only assignments, hindered CBP's operations." Plaintiff's brief at 18. Point of order: not all ports used non-CBPOs for searches. A watch commander from the Port of San Diego testified that his port, like Tampa, designated female-only slots for certain CPBO shifts to ensure that female officers were available to search female passengers. *See* Doc. 117 at 39–42. In any event, we do not understand why plaintiffs think CBP's operations were not "hindered." As we have explained, the evidence clearly showed that CBP officers at the Port of Tampa had deviated from CBP search

31

policies in 2016 and 2017, either by having men conduct or witness the search of female travelers or by not conducting searches at all. Lack of compliance undoubtedly hindered privacy and security.

Plaintiffs point to the Fresno port director's testimony about her port's reliance on female TSA personnel to witness searches. *See* Plaintiff's brief at 20. But she did not help plaintiffs' case. Quite the contrary, she testified that her port "typically" managed to staff at least two female CBPOs—even with just seven total officers—and they relied on female TSA personnel (strictly as witnesses) only when they were short one female officer. *See* Doc. 116 at 12–15. Thus, the Port of Fresno always had at least one female CBPO available. As we have explained, nothing about the port director's testimony condones or logically supports making *all* female CBPOs routinely unavailable, as plaintiffs have proposed for the evening shift at the Port of Tampa.

**B.    It was not unreasonable to conclude that CBP should not depend on off-duty female CBPOs to search female travelers.**

Finally, plaintiffs claim CBP need not have staffed female CBP officers in the evening because they could have called in off-duty female officers to search female travelers (and witness searches) as the need arose. *See* plaintiffs' brief at 22–26. That, however, would have been even more problematic than relying on non-CBP officers. There was no assurance that off-duty officers

would have been available at all. CBP officers are not issued government phones. Doc. 116 at 56 (plaintiff's testimony). Off-duty officers have no obligation to answer their personal phones or to be available for work outside of their scheduled tour of duty. *See id.;* Doc. 118 at 36 (assistant port director). Even if two off-duty female officers happened to answer the call and agreed to report, a traveler waiting to be searched would be stuck in limbo unpredictably, in the custody of another officer or a supervisor, until the responding officers arrived. *See* Doc. 118 at 36. On top of that, CBP would have had to pay overtime to responding off-duty officers, contrary to the agency's collectively-bargained responsibility to align tours of duty with CBP's workload and to "schedule all work assignment in a manner which minimizes the cost to the government or party in interest." *Id.* at 31. The jury could have reasonably thought that "rearrang[ing] job responsibilities" in this manner likewise would not have done much to vindicate CBP's search policies, and therefore would not have eliminated the clash between those interests and CBP officers' employment opportunities. *Hardin,* 691 F.2d at 1370–71.

Plaintiffs' main argument on this point is that the jury and the assistant port director were "not qualified to analyze how the regulatory duty to minimize costs affects the statutory duty to avoid discrimination." Plaintiffs' brief at 23. The regulation in question states in pertinent part that "regularly-

33

scheduled administrative tours of duty and assignments of Customs Officers to overtime work ... shall be made in accordance with the following priorities, listed below in the priority order:" (1) "Tours of duty should be aligned with the Customs workload." (2) "All work assignments should be made in a manner which minimizes the cost to the government or party in interest ..." 19 C.F.R. § 24.16(d) ("Work Assignment Priorities."). The court took judicial notice of the regulation and Assistant Port Director Diaz read it into the record without objection. *See* Doc. 118 at 26–30. Plaintiffs do not dispute that CBP would have had to pay off-duty officers time-and-a-half to report to work if called in unexpectedly. Relying on regularly scheduled officers to search passengers would obviously cost less. Plaintiffs do not dispute that either. Nor do they claim that CBP could have ignored section 24.16(d). They cite no authority and provide no reason to think that CBP erred by considering the relative cost of using off-duty officers to search travelers. Indeed, their collective bargaining agreement required it. *See* Doc. 118 at 30–31.

Plaintiffs ignore the relative cost of paying off-duty female officers 150% and focus instead on the total amount that CBP spent on overtime, as a fraction of the Port of Tampa's total operating costs, in 2016 and 2017. *See* Plaintiffs' brief at 24–25. Overtime pay may have been a small part of CBP's budget at the Port of Tampa in those years. *See* Doc. 118 at 146–50 (assistant

port director). But the regulation requires CBP to "minimize[] the cost" of "[a]ll work assignments" regardless of the size or scope. 19 C.F.R. § 24.16(d) (emphasis added). It does not permit CBP to maximize the cost of small or infrequent work assignments. Moreover, CBP rarely relied on off-duty officers to perform searches in 2016 and 2017. The only evidence that that had ever happened is one plaintiff's testimony that she was called in to conduct a search "before 2018," Doc. 116 at 34–35, and another plaintiff's testimony that she sometimes worked the evening shift and would have been able to "report into work" if she had been called back to conduct a search, *id.* at 182 –83. As we have explained, other evidence showed that CBP improperly resorted to on-duty male officers to search female travelers or failed to search them at all, which is why management determined it was necessary to schedule female officers. So, it should be no surprise that overtime costs were relatively low in 2016 and 2017. If CBP were to instead routinely rely on off-duty female CBPOs, as plaintiffs have proposed, total overtime costs would logically increase.

In any event, cost was just one nail in the coffin for plaintiffs' proposal to rely on off-duty female CBP officers. The evidence showed that CBP could not have counted on off-duty officers to search travelers, regardless of cost, because their availability was impossible to predict, as explained above. Two plaintiffs

35

testified that they could have reported to work within thirty minutes and had done so in the past to conduct a search. *See* Plaintiff's brief at 26–27. But Assistant Port Director Diaz explained the insurmountable obstacles to calling in off-duty officers on a regular basis. *See* Statement of Facts § III. It would not have been practical. The Port of Tampa had just eight female CBPOs in 2018. *See* Doc. 107-5 at 7 (Pl. Ex. 5). Two were needed for each search. *See* Doc. 107-3 at 16 (Pl. Ex. 3); Doc. 116 at 173 (plaintiff's testimony). It was not unreasonable for the jury to find that the small pool of off-duty female CBP officers would not have ensured adequate responses, on a regular basis, when female travelers needed to be searched.

**C.** **The jury's verdict was consistent with *Hardin*, *Garrett*, and all other cases addressing bona fide occupational qualifications.**

The cases that plaintiffs cite cast no doubt on the jury's finding that sex was a bona fide occupational qualification for the three slots that CBP designated for female CBP officers on the evening shift. The first case is *Hardin*. In *Hardin*, a county sheriff refused to hire the female plaintiff because of an "unwritten policy" requiring new deputies to start out in the county jail, which had 1,100 male inmates and just 50 female inmates. *Hardin*, 691 F.2d at 1367–68. The sheriff claimed that sex was a bona fide occupational qualification to work in the jail, *id*. at 1370–72, and that he therefore could not

36

hire the plaintiff as a deputy, because he preferred that new deputies start at the jail, "out of the public eye," "until they [were] issued a gun and a uniform at the end of a six-month probationary period," *id.* at 1367. This Court rejected the sheriff's BFOQ defense for two reasons. First, the sheriff had "waived" his unwritten policy and allowed new deputies to skip introductory jail duty "on a number of occasions without apparent detriment to the Department." *Id.* at 1372. Deputies could work outside the jail, in the courthouse, juvenile court, or in "warrant cars." *Id.* at 1369. This Court observed that the sheriff's practice of assigning new deputies to the jail for six months "might [have been] compelling" if it had been part of "a bona fide seniority system arrived through collective bargaining," but "it cannot justify this informal assignment policy which all but bars women from the Sheriff's Department." *Id.* at 1372.

Second, the evidence showed that female deputies could perform certain duties at the county jail without "unnecessarily invad[ing] … the inmates' retained privacy rights." *Hardin,* 691 F.2d at 1373. Even in the male section, most deputy positions were "noncontact" and did "not require strip searches or observation of inmates' use of shower or toilet facilities." *Id.* at 1368, 1373. So, by rotating assignments, the sheriff could staff female deputies at the jail while "avoid[ing] the clash between privacy rights and equal employment opportunities" and "without … substantially affecting the efficient operation of

37

the Sheriff's Department or undermining its essential functions." *Id*. at 1373. For these reasons, this Court held that "the BFOQ exception to Title VII does not justify defendants' arbitrary practice of funneling deputy sheriffs through positions reserved almost exclusively for males"—that is, in the county jail, where they did not need to be placed, and performing duties that female deputies did not need to perform. *Id*. at 1374.

This case is nothing like *Hardin*. Here, unlike in *Hardin*, bypassing the asserted BFOQ was shown to be detrimental. Without sufficient female CBP officers on duty, female travelers at the Port of Tampa were improperly searched by men or not searched at all, contrary to CBP policy and the privacy rights of female travelers. *See* Statement of Facts § II. That is why CBP created the female-only positions. Those assignments were negotiated "in the context of a bona fide seniority system arrived at through collective bargaining" (*Hardin*, 691 F.2d at 1372)—the BRP process. *See* Statement of Facts § III. That "compelling" factor weighs in favor of the proffered BFOQ, as this Court observed in *Hardin*, where, to the contrary, the problematic sex-based classification had been an "informal" and "unwritten" policy. *See Hardin,* 691 F.2d at 1372.

The most significant distinction is that *Hardin* involved an employer's refusal to hire a female applicant, even for roles that female deputies could

indisputably perform, because of a purported need to "funnel" the plaintiff through a temporary position where female deputies could perform most but not all duties. Here, by contrast, plaintiffs challenge their assignment to a specific shift when female officers were needed to perform a specific task that male officers could not perform. There was no other way in this case to "rotat[e] assignments … without either substantially affecting the efficient operation of [CBP] or undermining its essential functions," *id*. at 1373, as we have explained. Men should not search female travelers at customs (except for justified security pat-downs). No one disputes that. The obvious way to ensure that they don't is by scheduling female CBP officers to be available for those searches. This is not the type of "discrimination" that Title VII was intended to prohibit. *See* 42 U.S.C. § 2000e-2(e).

The second case is *Garrett*. In *Garrett*, a county sheriff had refused to promote female jail employees from "matrons/dispatchers" to "correctional officers" because an old regulation had purportedly prohibited female correctional officers from guarding male inmates. *Garrett*, 734 F.2d at 622–24. The sheriff promoted them years later, after the regulation was amended. *Id*. at 622–24. This Court again rejected the sheriff's BFOQ defense for two reasons. First, the old regulation had not said what the sheriff claimed. It had in fact been "neutral on its face, requiring a male [guard or employee] to accompany

39

a female [visitor] in a male-inmate facility *and* vice versa." *Id.* at 624 (emphasis in original). Evidence at trial "showed that other Florida counties were using female correctional officers" even under the old regulation. *Id.* And, even if the old regulation had purported to prohibit female officers from guarding male inmates, "the mere fact that a state enacts a discriminatory regulation does not create a BFOQ defense for one who follows such a regulation." *Id.* The sheriff "came forth with no evidence that the use of female correctional officers" after the regulation was amended had "in any way hindered the efficient operation" of the jail. *Id.* Nevertheless, the sheriff essentially argued "that the same women who apparently [were] working out well as correctional officers today would not have worked out prior to [the amendment], with the same qualifications." *Id.* This Court "[could not] accept that argument." *Id.*

*Garrett* likewise does not undermine the Secretary's BFOQ defense in this much different case. Here, there was uncontroverted evidence of a necessary qualification relating to the essence of CBP operations, and there was substantial evidence from which the jury reasonably found no viable alternative. Everyone agrees that CBP should conduct same-sex border searches. The question here is whether the agency may take that into account in scheduling CBP officers. Neither *Hardin* nor *Garrett* suggests that it cannot.

This case is more like *Dothard v. Rawlinson*, 433 U.S. 321 (1977). In

40

*Dothard*, the plaintiff was rejected for a prison-guard job in a male penitentiary. *Id*. at 323. The Supreme Court held that a minimum weight requirement that effectively excluded most women from most positions was not a bona fide occupational qualification, *id.* at 328–32, but a separate regulation that facially prohibited women from positions involving contact with male inmates was a BFOQ, *id*. at 332–36. "The essence of a correctional counselor's job is to maintain prison security," the Court observed. *Id*. at 335. "A woman's relative ability to maintain order in a male, maximum-security unclassified penitentiary of the type Alabama now runs could be directly reduced by her womanhood." *Id*. There was a "basis in fact for expecting that sex offenders who have criminally assaulted women in the past would be moved to do so again if access to women were established within the prison." *Id*. And there would be "a real risk that other inmates, deprived of a normal heterosexual environment, would assault women guards because they were women." *Id*. There was "substantial testimony from experts on both sides of [the] litigation that the use of women as guards in 'contact' positions under the existing conditions in Alabama maximum-security male penitentiaries would pose a substantial problem, directly linked to the sex of the prison guard." *Id*. at 336. Considering all this, the Supreme Court held that the district court had erred by ruling that "being male is not a bona fide occupational qualification for the

41

job of correctional counselor in a 'contact' position." *Id*. at 336–37.

Here, as in *Dothard*, there was "substantial testimony" that discriminating by sex was necessary to address a "substantial problem" directly related to the employees' sex. *Dothard*, 433 U.S. at 336. The problem in *Dothard* was that female guards would not be safe in contact with male inmates at a maximum-security prison. The problem with CBP border searches is similar in kind but opposite in effect: female guards are necessary because male guards may not search or witness the search of female travelers. The jury reasonably found that sex was a bona fide occupational qualification for these few female-only positions, consistent with *Dothard*, *Hardin*, and *Garrett*. The district court correctly declined to set aside the verdict.

## Conclusion

For these reasons, this Court should affirm the district court's denial of

plaintiffs' motion for judgment as a matter of law.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

DAWN A. TIFFIN
Assistant United States Attorney
Appellate Division

By:    *s/ Sean Siekkinen*

*Of Counsel:*                                              AUTHOR NAME
                                                                          Assistant United States Attorney
                                                                          Appellate Division
CATHERINE M. PALER-AMAYA              USA No. 192
Senior Attorney                                          400 N. Tampa St., Ste. 3200
Office of the Assistant Chief Counsel    Tampa, FL 33602
U.S. Customs and Border Protection      (813) 274-6000
Tampa, FL                                                sean.siekkinen@usdoj.gov
(813) 623-6331 x 2
catherine.m.paler-amaya@cbp.dhs.gov

## Certificate of Compliance with Type-Volume Limitation

This brief, which contains 10,013 countable words under 11th Cir. R. 32-4, complies with Fed. R. App. P. 32(a)(7)(B).

## Certificate of Service

I certify that on July 7, 2025, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

JESSICA HORNE, ESQ.
*Counsel for Plaintiffs-Appellants*

*s/ Sean Siekkinen*
SEAN SIEKKINEN
Assistant United States Attorney

gkpr/no/6-30-25

b_Anderson Tracy_US response brief FINAL szs 2100-4255-4628 v.1.docx